## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN NIXON, ) | |
| ) | |
| Plaintiff, ) | Case No. _____ |
| ) | |
| v. ) | JURY TRIAL DEMANDED |
| ) | |
| WAGEWORKS INC., STUART C. HARVEY ) | |
| JR., EDGAR MONTES, THOMAS A. ) | |
| BEVILACQUA, BRUCE G. BODAKEN, ) | |
| CAROL A. GOODE, JEROME D. ) | |
| GRAMAGLIA, ROBERT L. METZGER, and ) | |
| GEORGE P. SCANLON. ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against WageWorks, Inc. ("WageWorks" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with WageWorks, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed merger of WageWorks with HealthEquity, Inc. ("HealthEquity" or "Parent") and Pacific Merger Sub, Inc. Inc. ("Merger Sub") (the "Proposed Transaction").

1

2.      On June 26, 2019, WageWorks entered into an agreement and plan of merger (the "Merger Agreement"), whereby stockholders of WageWorks common stock will receive the right to receive $51.35 for each share of WageWorks common stock they own (the "Merger Consideration").

3.      On July 29, 2019, in order to convince WageWorks' public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections and related analyses completed by WageWorks' financial advisor with respect to the Proposed Transaction, Evercore Group L.L.C. ("Evercore"); (ii) the data and inputs underlying the financial valuation performed by Evercore; (iii) potential conflicts of interest on the part of Evercore; and, (iv) potential conflicts of interest on the part of the Individual Defendants.

5.      The special meeting of WageWorks' stockholders to vote on the Proposed Transaction is going to be scheduled soon, and consummation of the Proposed Transaction will occur on August 28, 2019 (the "Stockholder Vote").  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Stockholder Vote so WageWorks' stockholders can properly exercise their corporate voting rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to WageWorks'

public common stockholders sufficiently in advance of the upcoming stockholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, WageWorks' common stock trades on the New York Stock Exchange ("NYSE"), a market that is headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff Kevin Nixon is, and has been continuously throughout all times relevant hereto, the owner of WageWorks common stock.

11.     Defendant WageWorks is a Delaware corporation and maintains its principal executive office at 1100 Park Place, 4th Floor, San Mateo, California 94403.  WageWorks "is a leader in administering Consumer-Directed Benefits ("SDBs") which empower employees to lower their tax expense and provide healthcare related tools for employers to provide to their employees.  WageWorks provides companies with the technology, tools, and a comprehensive understanding of current regulations, and are dedicated to administering CDBs.  These include pre-tax spending accounts, such as Health Savings Accounts, health and dependent care Flexible Spending Accounts, Health Reimbursement Arrangement, plus commuter benefit services, including transit and parking programs, wellness programs, Consolidated Omnibus Budget Reconciliation Act, and other employee benefits."  Proxy, 1.  The Company's common stock trades on the NYSE under the ticker symbol "WAGE."  *Id.*

12.     Individual Defendant Stuart C. Harvey, Jr. ("Harvey") is and has been WageWorks' Executive Chairman of the Board and a member of its Board since September 2018.

13.     Individual Defendant Edgar Montes ("Montes") is and has been WageWorks' President and Chief Executive Officer and a member of its Board since April 2018.  Montes previously served as WageWorks' President, Chief Operating Officer, Senior Vice President, and Vice President.

14.     Individual Defendant Thomas A. Beilacqua ("Bevilacqua") is and has been a member of WageWorks' Board since November 2009.

15.     Individual Defendant Bruce G. Bodaken ("Bodaken") is and has been a member

4

of WageWorks' Board since September 2005.

16.     Individual Defendant George P. Scanlon ("Scanlon") is and has been a member of WageWorks' Board since October 2018.

17.     Individual Defendant Robert L. Metzger ("Metzger") is and has been a member of WageWorks' Board since February 2016.

18.     Individual Defendant Jerome D. Gramaglia ("Gramaglia") is and has been a member of WageWorks' Board since October 2003.

19.     Individual Defendant Carol A. Goode ("Goode") is and has been a member of WageWorks' Board since April 2019.

20.     The defendants identified in Paragraphs 12 through 19 above are collectively referred to herein as the "Board" or the "Individual Defendants," and together with WageWorks, the "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**Background of the Company and the Proposed Transaction**

21.     According to its Website, WageWorks "simplify[ies] the complex world of Consumer-Directed Benefits.  We make benefits programs easier to understand and use so that everyone can take advantage of pre-tax savings and focus on what matters most."

22.     WageWorks was incorporated in Delaware in 2000, and became a publicly traded company with its initial public offering on May 9, 2012.

23.     After going public in 2012, WageWorks initially grew by leaps and bounds.  The closing price of WageWorks common stock on February 28, 2018 was $52.45.

24.     On March 1, 2018, WageWorks announced that it was delaying the filing of its Form 10-K for the fiscal year ending December 31, 2017 because of material weaknesses in its

system of internal controls and its practices and controls as to its accounting and preparation of earnings disclosures were ineffective. Because of these material weaknesses, the Company announced, among other things, that: (i) it would not be timely filing its 10-K for the prior fiscal year; (ii) its financial statements for certain periods in 2016 and 2017 needed to be restated; (iii) the financial restatements would lead to decreases in revenue, net income and adjusted EBITDA for fiscal year 2016 relative to what was reported; (iv) the formation of a special committee of directors independent from the Company's Audit Committee to carry out an independent investigation of the Audit Committee's investigation in response to concerns raised by KPMG; (v) the resignations of several members of its management, including its Chief Executive Officer, Chief Financial Officer, and general counsel; and (vi) its failure to comply with the NYSE's listing requirements and continued operation under an extension period so that WageWorks would be able to complete and file its 2017 Form 10-K. As a result, the trading price of WageWorks stock fell precipitously, with a closing price on March 1, 2018 of $42.70, a drop of almost 20%.

25. After announcing these flaws on March 1, 2018, WageWorks stock cratered throughout the next year, until WageWorks finally regained investors' faith when it issued a pre-market press release on March 14, 2019 entitled *WageWorks Announces Investor Conference Call to Review Financial Results and Outlook*:

SAN MATEO, Calif., March 14, 2019 (GLOBE NEWSWIRE) -- WageWorks, Inc. (NYSE: WAGE), a leader in administering Consumer-Directed Benefits, announced today that it will be hosting an investor call to discuss the company's recent financial results and outlook on Monday, March 18, 2019 at 2 p.m. PDT (5 p.m. EDT).

The company expects to file with the U.S. Securities and Exchange Commission (SEC) a majority of its delayed quarterly and annual reports before Tuesday evening, March 19, 2019. As a result, the company expects that its common stock will continue to be listed for trading on the New York Stock Exchange (NYSE). The Company's Annual Report on Form 10-K for its 2018 fiscal year, however, will not be filed until a later date.

**Conference Call Details**

The company has scheduled a conference call for Monday, March 18, 2019 at 2 p.m. PDT (5 p.m. EDT). The dial-in number for individuals wishing to participate is (844) 778-4142 (Domestic Toll-Free) or (661) 378-9625 (International), and the conference ID is 6278496. A telephonic replay of this conference call will be available via WageWorks' website for five calendar days. For individuals wishing to listen to the replay, the dial-in number is (855) 859-2056 and the conference ID is 6278496. Interested parties can access the event live and view the accompanying slide presentation through the "Investor Relations" section of WageWorks' website at http://wageworks.com.

26.     Following the announcement that WageWorks was finally going to be able to report its financial results, WageWorks' trading price rebounded significantly, increasing 30% at market open on March 14, 2019.

27.     The Motley Fool observed in its March 14, 2019 article, *WageWorks Inc. Stock up 31% Today: What You Need to Know*, which addressed the increase in trading price following the issuing of WageWorks' March 14, 2019 press release: "Needless to say, today's announce that the company was – finally – getting closer to the finish line on reporting its financial results has the market exuberant today," but "whatever investors decide to do with WageWorks right now is heavily built on speculation," so the "best advice to anyone following WageWorks now is to sit on their hands and wait to actually see the company's financial results before forming an investment decision."

28.     On March 25, 2019, WageWorks issued another Press Release, entitled *WageWorks Provides Update on Form 10-K Filing*:

SAN MATEO, Calif., March 25, 2019 (GLOBE NEWSWIRE) -- WageWorks, Inc. (NYSE: WAGE), a leader in administering Consumer-Directed Benefits, today provided an update regarding its Form 10-K for the fiscal year ended December 31, 2018 (the "Form 10-K").

As reported by WageWorks in its Form 12b-25 filed with the Securities and Exchange Commission (the "SEC") on February 28, 2019, the Company was unable to file its Form 10-K within the prescribed time period without unreasonable effort or expense.  The extension period provided under Rule 12b-25 expired on March 18, 2019.

The Company continues to work diligently to complete the preparation of its consolidated financial statements in order to be in a position to file its Form 10-K for the fiscal year ended December 31, 2018 with the SEC as soon as possible, but in any event no later than May 2019. The Company expects to file its Form 10-Q for the quarter ended March 30, 2019 in June 2019. In summary, the Company anticipates achieving compliance with the periodic and annual report requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act") in June 2019 at the latest.

The Company also announced that, as expected, it has received a notice from the New York Stock Exchange (the "NYSE") indicating that the Company is not in compliance with the NYSE's continued listing requirements under the timely filing criteria outlined in Section 802.01E of the NYSE Listed Company Manual as a result of the Company's failure to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2018.

The NYSE informed the Company that, under the NYSE's rules, the Company will have six months from March 1, 2019 to file the Form 10-K with the SEC. The Company can regain compliance with the NYSE continued listing requirements at any time before that date by filing the Form 10-K with the SEC. If the Company fails to file the Form 10-K before the NYSE's six-month compliance deadline, the NYSE may grant, at its sole discretion, an extension of up to six additional months for the Company to regain compliance, depending on the specific circumstances.

29.     On Friday, April 26, 2019, WageWorks filed its Amended Form 10-K for the Fiscal Year that Ended December 31, 2016.

30.     The following Monday, April 29, 2019, WageWorks issued another Press Release, entitled *WageWorks Confirms Receipt of Proposal from HealthEquity*:

SAN MATEO, Calif., April 29, 2019 (GLOBE NEWSWIRE) -- WageWorks, Inc. ("WageWorks") (NYSE: WAGE), a leader in administering Consumer-Directed Benefits, confirms that it has received an unsolicited, non-binding proposal from HealthEquity, Inc. (NASDAQ: HQY). The WageWorks Board of Directors, in consultation with its financial and legal advisors, will continue to carefully review the proposal in order to pursue the course of action that is in the best interests of all WageWorks shareholders.

WageWorks' Board and management team, consisting of our new CEO, CFO, General Counsel and Executive Chairman, as well as two new independent directors, remain intensely focused on executing the recently articulated growth strategy, delivering the high-quality service that our customers have come to expect, and creating shareholder value, which has resulted in year-to-date returns of over 50%.

31.     As the April 29, 2019 Press Release states, the unsolicited proposal from HealthEquity came at a time when WageWorks stock was just beginning to recover.  Therefore, the Proposed Transaction comes at a time when WageWorks' recent and future success was not fully reflected by its share price.  The Proposed Transaction will "compensate" WageWorks stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

32.     Despite WageWorks' intrinsic value and growth prospects, the Individual Defendants are agreeing to sell the Company and depriving its stockholders of the ability to partake in the Company's future growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiffs and the Class to receive an inadequate Merger Consideration.

**The Background of the Proposed Transaction**

33.     On October 24, 2018, the WageWorks Board held a special meeting with members of management and representatives of Evercore, Wilson Sonsini Goodrich and Rosati P.C. ("Wilson Sonsini," WageWorks' outside corporate legal counsel), Skadden Arps Slate Meagher & Flom LLP ("Skadden," outside legal counsel to the independent directors of WageWorks' board), BDO USA LLP ("BDO," an accounting firm), Macias Gini & O'Connell LLP ("MGO," another accounting firm), and KPMG LLP ("KPMG," WageWorks' outside accounting firm at that time).  Proxy, 22.  At the time of the October 24, 2018 Meeting, WageWorks' common stock

was trading at approximately $40.17 per share as a result of the issues stemming from its failed accounting practices.  *Id.*

34.     At the October 24, 2018 Meeting, the WageWorks Board "discussed how to remedy WageWorks' financial reporting and bring WageWorks current in its SEC filing obligations."  Proxy, 23.  Representatives of BDO and MGO presented proposals regarding completing the audit services and SEC filings, and representatives of KPMG indicated that KPMG "could not commit to a timeline to complete the financial statement filings[.]"  *Id.*  Representatives of Evercore "advised the WageWorks board and management regarding strategic alternatives and contingency plans available to WageWorks should WageWorks not become current in its SEC filings by March 19, 2019.  The WageWorks board discussed that it may be prudent to have some limited discussions with third parties regarding a potential sale of WageWorks as a contingency plan for responding to activist pressures."  *Id.*

35.     On October 31, 2018, the WageWorks Board held a special meeting where Harvey "updated the WageWorks board that, based on recent discussions with KPMG, KPMG would not be able to meet the audit timeline necessary," and the Company's Audit Committee "determined that it was in the best interests of WageWorks and its stockholders to dismiss KPMG."  Proxy, 23.  The Audit Committee further decided to engage BDO and MGO as independent registered public accounting firms and "discussed the engagement of a financial advisor to assess stockholder activities and the strategic alternatives and contingency plans that Evercore had raised at the October 24, 2018 Meeting."  *Id.*  The Board instructed members of management "to initiate discussions with third parties, including financial sponsors that could have an interest in engaging in a strategic transaction with WageWorks, and to involve Evercore in such discussions, as appropriate."  *Id.*

36.     On November 26, 2018, representatives of Evercore had a telephone call with a representative of a financial sponsor, Sponsor A to discuss the "the potential merits of a business combination between WageWorks and a portfolio company of Sponsor A[.]"  Proxy, 24.

37.     On December 3, 2018, a representative of "a financial sponsor" contacted Harvey "to discuss such financial sponsor's potential interest in exploring discussions regarding a strategic transaction with WageWorks," and followed this contact up with a December 7, 2018 letter to Harvey "confirming its interest to partner with another financial sponsor in acquiring WageWorks."  Proxy, 24.  But ultimately, this financial sponsor did not engage in "further substantive discussions," and "it did not execute a confidentiality agreement with WageWorks." *Id.*  Although this financial sponsor did not execute a confidentiality agreement, the Proxy does not disclose the identity or nature of the business of this "financial sponsor," the other financial sponsor that would have "partnered" with it, or why it did not engage in further substantive discussions with WageWorks.  *Id.*

38.     On December 3, 2018, a representative of an investment bank contacted Evercore to broker a meeting between a strategic party, Party A, and WageWorks.  Proxy, 24.

39.     Also on December 3, 2018, the WageWorks Board held a regularly scheduled meeting with WageWorks management and representatives of BDO, MGO, Evercore, Wilson Sonsini, Skadden, and Sidley Austin LLP ("Sidley Austin," outside counsel for the independent investigation of the Audit Committee Investigation).  Proxy, 24.  Representatives from Evercore "discussed the strategic alternatives and contingency plans available to WageWorks in response to actions undertaken by stockholders and the possibility that WageWorks might not become current in its SEC filings by March 19, 2019, and provided a summary of recent discussions and inquiries that certain third parties, including Sponsor A, had with Evercore or members of

WageWorks management." *Id.* The WageWorks board instructed management to prepare financial projections and, with the assistance of Evercore, to evaluate the "various alternatives available to WageWorks, including a potential strategic transaction, in the event WageWorks did not become current in its SEC filings by March 19, 2019." *Id.* The WageWorks board decided to formally engage Evercore in "developing strategic alternatives that might be available to WageWorks in response to stockholder actions and the possibility that WageWorks might not become current in its SEC filings in time to avoid delisting with the NYSE, and in advising the Company in the event it received potential interest from third parties in acquiring WageWorks." *Id.*

40.     On December 5, 2019, a representative of Sponsor A advised Evercore that it "could not engage in any type of discussion regarding a possible strategic transaction until 2019." Proxy, 24.

41.     On December 5, 2018, a representative of an investment bank contacted Harvey on behalf of another financial sponsor, Sponsor B, to "discuss Sponsor B's potential interest in engaging in a strategic transaction," and arranging a meeting in January 2019. Proxy, 24.

42.     On December 12, 2018, a representative of a financial sponsor met with Harvey, and the financial sponsor followed up on December 31, 2018, with a letter to WageWorks management indicating its general interest in "acquiring 100% of the outstanding shares of WageWorks for a cash consideration of at least $35 per share." Proxy, 24. As WageWorks stock was trading at approximately $27.00 at the time, and $35 per share in consideration represented about a 30% premium over WageWorks' trading price. "Ultimately, this financial sponsor did not engage in further substantive discussions with management" and did not execute a confidentiality agreement. *Id.*, 24-25. Although this financial sponsor did not execute a

confidentiality agreement, the Proxy does not disclose the identity or nature of the business of this "financial sponsor" and does not disclose why it did not engage in further substantive discussions.

43.     On January 8, 2019, Harvey held a meeting with a representative of another financial sponsor regarding a strategic transaction.  Proxy, 25.  Although this financial sponsor followed up the next day to confirm its interest in an email, "[u]litmately, this financial sponsor did not engage in further substantive discussions," and did not execute a confidentiality agreement.  *Id.*  Although this financial sponsor did not execute a confidentiality agreement, the Proxy does not disclose the identity or nature of the business of this "financial sponsor" and does not disclose why it did not engage in further substantive discussions.

44.     On January 11, 2019, the WageWorks Board held a regularly scheduled meeting where representatives of Evercore updated the Board regarding the Company's "stock price performance and recent analyst reports and potential areas that stockholder activists might focus on, including WageWorks' board structure, compensation structure, stockholder rights, and audit and risk oversight."  Proxy, 25.  The Board advised Evercore that it believed "third parties were looking to take advantage of WageWorks' then-current stock price of approximately $27.87 per share, which, in the WageWorks' board's estimation, did not reflect WageWorks' intrinsic value."  The Proxy does not disclose what the Board estimated WageWorks' intrinsic value to be at the time of the January 11, 2019 Meeting.  The Board and representatives of Evercore "also discussed the likelihood that BDO and MGO would complete their respective audits" such that WageWorks could "become current in its SEC filings by March 19, 2019."  *Id.*  The Proxy does not disclose the substance of these discussions and whether the Board and/or Evercore found it likely that BDO and MGO would complete these audits and WageWorks would become current.

45.     On January 14, 2019, Harvey had a telephone call with another financial sponsor, Sponsor C regarding a strategic transaction.  Proxy, 25.

46.     On January 15, 2019, a representative of Evercore spoke with a representative of another financial sponsor, Sponsor D.  Proxy, 25.

47.     On January 28, 2019, Sponsor A "reiterated its interest in a strategic combination[.]"  Proxy, 25.

48.     On January 29, 2019, the Board held a regularly scheduled meeting, with management, Evercore and Wilson Sonsini, at which they discussed the timeline for work and scheduled by BDO and MGO, "including management's expectation that WageWorks would be in compliance with the listing requirements of the NYSE by early March 2019."  Proxy, 25-26. Management the discussed WageWorks' "financial projections, and Evercore led the WageWorks board through an initial valuation framework, as well as stockholder engagement strategies the WageWorks board and management should consider implementing following the anticipated completion of the financial statement filings."  *Id.*  The Proxy does not disclose whether Evercore and the Board reached an actual estimated value in its "initial valuation framework," and if so what the estimated value was.

49.     On February 13, 2019, Harvey, members of management, and certain members of the WageWorks Board "held a dinner meeting with representatives from Sponsor C."  Proxy, 26. "Ultimately, Sponsor C did not engage in further substantive discussions with management and did not execute a confidentiality agreement with WageWorks."  The Proxy does not disclose which "certain members of the WageWorks Board" were present for this dinner meeting, and although Sponsor C did not execute a confidentiality agreement, the Proxy does not disclose the identity or nature of the business of this "financial sponsor" and does not disclose why it did not

engage in further substantive discussions.

50.     On April 1, 2019, Montes had a telephone call with a representative of a strategic party, Party B to discuss "the possible expansion of the parties' commercial relationship." Proxy, 27. The Proxy does not disclose the scope or extent of the parties' prior existing commercial relationship, if any, or the extent to which that relationship, if any, might be expanded pursuant to this discussion.

51.     On April 8, 2019, representatives of a financial sponsor, Sponsor E, met with a representative of WageWorks. Proxy, 27. The Proxy does not disclose the identity of the "representative" of WageWorks who met with the representatives of Sponsor E and does not state whether he or she was a representative from WageWorks' management or Board.

52.     On April 9, 2019, WageWorks issued a Press Release to announce that Goode had been appointed to the Board.

53.     On April 11, 2019, Jon Kessler ("Kessler") the President and CEO of HealthEquity, contacted Montes. Proxy, 27. Later that day, HealthEquity followed up on this contact with "an unsolicited, non-binding indication of interest from HealthEquity expressing its interest in acquiring WageWorks for $50.50 per share in cash," (the "April 11 Offer") along with "a proposed confidentiality and standstill agreement intended to facilitate a 30 day due diligence period and a letter from Wells Fargo Bank, N.A. and Wells Fargo Securities, LLC evidencing an initial commitment to finance the proposed acquisition." *Id.* The proposal requested that WageWorks respond by April 19, 2019. At the time, WageWorks' common stock was trading at approximately $40.13 per share, and the $50.50 per share offer represented a premium of approximately 26% over the trading price.

54.     On April 17, 2019, the WageWorks board held a special meeting to discuss the

April 11 Offer, and determined to have a "more comprehensive review" at the next Board meeting scheduled for April 25, 2019.  Proxy, 27.  Following this meeting, Harvey e-mailed Kessler to acknowledge receipt of the April 11 Offer and indicate that WageWorks could not respond before the April 19, 2019 deadline.  *Id.*

55.     On April 24, 2019, Kessler telephoned Harvey regarding WageWorks' deliberations on the April 11 Offer, and Harvey "committed to provide a meaningful response" during the April 29, 2019 week.  Proxy, 27.

56.     On April 25, 2019, the WageWorks Board held a regularly scheduled meeting, with members of WageWorks management, Evercore, and Wilson Sonsini.  Proxy, 27.  At the meeting Harvey updated the Board "regarding recent communications with representatives of HealthEquity," and "representatives of Evercore presented a preliminary valuation of WageWorks based on financial projections generated by WageWorks management and discussed the valuation in the context of the April 11 Offer." *Id.*, 27-28.  "Representatives of Evercore the led a discussion of potential strategies," which included "contacting other parties to assess their interest in a potential acquisition" and "entering into a confidentiality and standstill agreement with HealthEquity to enable HealthEquity to better understand WageWorks' business and operations and thereby allow HealthEquity to potentially increase its proposed purchase price above the $50.50 per share price set forth in the April 11 Offer." *Id.*, 28.  "The WageWorks board discussed each alternative[.]" *Id.*  The Proxy does not disclose the substance of the Board's discussion of each of these alternatives, or whether its ultimate determination as to how to proceed was unanimous.

57.     On April 29, 2019, Harvey, Montes, and Kessler discussed the April 11 Offer, and Harvey "indicated that the WageWorks board did not believe the proposed price of $50.50 per

share was sufficient, but that the WageWorks board supported continued discussions between WageWorks and HealthEquity and intended to provide HealthEquity with access to confidential diligence materials in furtherance of pricing discussions, subject to a revised confidentiality and standstill agreement." Proxy, 28.

58.     On April 29, 2019, Kessler advised Harvey by text message that HealthEquity "had received questions from the press regarding the April 11 Offer." Proxy, 28. Following this text message and "press reports speculating over a potential offer from HealthEquity," WageWorks issued a press release confirming the "unsolicited, non-binding proposal." *Id.* HealthEquity issued a Press Release the following day, "confirming that it had made a non-binding proposal to acquire WageWorks for $50.50 per share in cash." *Id.* The Proxy does not state whether the "press reports speculating over a potential offer from HealthEquity" were based on information that was leaked by persons at or acting on behalf of WageWorks and/or by persons at or acting on behalf of HealthEquity.

59.     The WageWorks Board held a special meeting on April 30, 2019, with members of management, Evercore, Wilson Sonsini, and Sard Verbinnen & Co., ("Sard,"), outside public relations consultant for WageWorks. Proxy, 28. Harvey updated the Board regarding his discussions with HealthEquity and recent news reports regarding the April 11 Offer. *Id.* At the Board's request, representatives of Evercore "led a discussion regarding potential strategies," which included "conducting a market check to gauge the interest of third parties in a potential acquisition of WageWorks, instituting a preferred stockholder rights plan to increase the leverage of WageWorks' existing stockholders, and/or entering into a confidentiality and standstill agreement with HealthEquity to permit the sharing of non-public information to potentially increase the purchase price of the April 11 Offer." *Id.* "Following extended discussion and

consideration, the WageWorks board instructed Evercore to commence a market check of financial sponsors and strategic parties that may have interest in a strategic transaction with WageWorks, stipulated to Evercore and Wilson Sonsini that any third-party with interest in 30pursuing such a strategic transaction must enter into a confidentiality agreement with WageWorks, which confidentiality agreement should contain standstill provisions unless, in the determination of WageWorks management, there is sufficient justification to not require such provisions, and directed Evercore and Wilson Sonsini to negotiate a confidentiality agreement with HealthEquity that prevented HealthEquity from commencing takeover efforts or using confidentiality information of WageWorks in any hostile action to acquire the Company for a reasonable period of time." Proxy, 28-29.

60.     On April 30, 2019, representatives of Evercore "commenced a strategic process that would result in Evercore reaching out to seventeen strategic parties and/or financial sponsors." Proxy, 29. "Ten parties, including HealthEquity, executed confidentiality agreements with WageWorks, with nine of such agreements, including that of HealthEquity, containing standstill provisions that would terminate upon WageWorks having entered into a definitive agreement to effectuate a business combination, and certain of which standstill provisions, including that of HealthEquity, would terminate upon a third party announcing a tender offer to acquire more than 50% of WageWorks' outstanding shares of common stock." *Id.* "Eight parties, including HealthEquity, received access to a virtual data room containing non-public information of WageWorks, and five parties attended management meetings with WageWorks." *Id.* The Proxy does not disclose how many of the nine standstill agreements terminated upon a third party's tender offer, or which potential counterparties entered these standstill agreements.

61.     Shortly thereafter, WageWorks management and Evercore engaged in discussions

with representatives of Party C, a strategic party, Party B, Sponsor A, Party, Sponsor D, Sponsor E, and Party D, who all confirmed interest in pursuing a potential strategic transaction with WageWorks.   The Proxy does not disclose whether any of these potential counterparties communicated a proposal, or whether any of these potential counterparties otherwise expressed an interest in "beating" the $50.50 per share offer that WageWorks and HealthEquity had recently publicly confirmed in their respective press releases.

62.     On May 3, 2019, HealthEquity's outside counsel, Willkie Farr & Gallagher LLP ("Willkie") sent a second proposal to WageWorks (the "May 3 Letter"), which "proposed to acquire all of the issued and outstanding shares of common stock of WageWorks," for "merger consideration in the amount of $50.50 for each share of WageWorks common stock outstanding," contingent upon a "30 day 'go-shop' period with the ability to continue discussions with a party that has submitted a written proposal that is a superior proposal, and a termination fee of 3.5% of the equity value of WageWorks in the event WageWorks entered into an alternative proposal, or 1.5% of the equity value of WageWorks in the event WageWorks entered into an alternative proposal with an 'excluded party'."  Proxy, 29-30.

63.     On May 5, 2019, the WageWorks Board held a special meeting regarding "communications with HealthEquity, other potentially interested parties, and certain significant customers and stockholders."  Proxy, 30.  The Board further discussed "the inadequacy of the $50.50 offer," and "authorized Evercore to request initial indications from the parties involved in the strategic process by May 24, 2019."  Proxy, 30.  The Board determined that "it was in the best interests of WageWorks and its stockholders for management both to engage directly with HealthEquity and to continue the strategic process with potentially interested third parties[.]"  *Id.* The Proxy does not disclose whether the Board specifically discussed any "other potentially

interested parties" and, if so, which, and also does not provide any details as to these "significant customers and stockholders" or why they were discussed at this special meeting.

64.     Also on May 5, 2019, Harvey and Kessler had a telephone call during which Harvey told Kessler that the May 3 Letter "was viewed as constructive," that the WageWorks Board had directed Evercore to work with HealthEquity's financial advisors directly, and "an in-person meeting between Mr. Harvey and Mr. Kessler should occur following resolution of the confidentiality and standstill agreement discussions." Proxy, 30.  WageWorks and HealthEquity entered a confidentiality and standstill agreement on May 7, 2019. *Id.*

65.     On May 13, 2019, Harvey Kessler, and Stephen D. Neeleman ("Neeleman"), HealthEquity's founder and vice chairman, "held a dinner meeting to meet in-person and discuss HealthEquity's due diligence process in respect of the Company." Proxy, 30.  Harvey told Kessler and Neeleman that the Board had not agreed to sell the Company for $50.50 per share and expected HealthEquity "to increase its proposed offer price following the due diligence process." *Id.*  Kessler advised that "prompt access to comprehensive due diligence materials would be the fastest path to potential additional value for WageWorks' stockholders, and the parties committed to schedule management meetings between members of" WageWorks' and HealthEquity's management. *Id.*

66.     On May 14, 2019, the WageWorks Board held a special meeting regarding "communications with HealthEquity, other potentially interested third parties, and certain significant customers and stockholders." Proxy, 30-31.  "The WageWorks board then directed Wilson Sonsini to deliver a revised draft of the merger agreement to Willkie in line with the discussion of the material terms of the merger agreement[.]" *Id.*  The WageWorks Board "directed members of management and representatives of Evercore again to convey to

HealthEquity that the WageWorks board believed that HealthEquity's offer of $50.50 per share did not adequately value the Company." *Id.* The Proxy does not disclose how much consideration per-share the WageWorks Board instructed Wilson Sonsini to provide for in its "revised draft of the merger agreement."

67.     On May 17, 2019, Wilson Sonsini delivered a draft merger agreement to Willkie that "contemplated, among other things, a 60 day 'go-shop' period with an ability to continue with a party that has submitted a written proposal that is reasonably likely to lead to a superior proposal, and a termination fee of 3% of the equity value of WageWorks in the event WageWorks entered into an alternative proposal, or 1% of the equity value of WageWorks in the event WageWorks entered into an alternative proposal with an 'excluded party.'" Proxy, 31.  Again, the Proxy does not disclose how much consideration per-share the WageWorks Board instructed Wilson Sonsini to provide for in its "revised draft of the merger agreement."  The Proxy also does not disclose whether there were parties that would have been considered "Excluded Parties" subject to the "go-shop" provision at the time Wilson Sonsini delivered the May 17, 2019 draft merger agreement, and if so, the identity of those parties and the material terms of their outstanding alternative written proposals.

68.     On May 24, 2019, Parties A, D and E, and Sponsors A, B, D, and E, did not submit an initial indication, "citing among other things, their inability to exceed the price set forth in the April 11 Offer.  Proxy, 31.

69.     Also on May 24, 2019, Party B "communicated to Evercore that it maintained interest in acquiring WageWorks," but "did not provide specificity on purchase price."  Proxy, 32.

70.     Also on May 24, Party C submitted a preliminary, non-binding letter of intent to

acquire WageWorks for $55.50 per share in cash, which proposal was conditioned on Party C identifying a third-party financial sponsor that would provide financial assistance to Party C in acquiring WageWorks and also agree to acquire a related carve-out business."  Proxy, 31-32. Party C further indicated it would need "six-to-eight weeks to select a third-party financial sponsor partner and conduct the requisite due diligence on WageWorks."  Proxy, 32.  "At this time, WageWorks made non-public information available to Party C[.]"  *Id.*

71.      On May 30, 2019, WageWorks filed its 2018 Form 10-K with the SEC.  Proxy, 32.

72.      On June 4, WageWorks management "learned that HealthEquity had acquired approximately 1.6 millions shares of WageWorks common stock from February 1, 2019 through April 4, 2019, which represented in the aggregate approximately 4% of the issued and outstanding shares of WageWorks common stock."  Proxy, 32.

73.      On June 14, HealthEquity "submitted a revised proposal to acquire WageWorks for $51.00 per share in cash, which offer was not subject to due diligence but was subject to the successful negotiation of the merger agreement."  Proxy, 32.  HealthEquity "increased its offer by $0.50 per share in response to WageWorks board's stated belief that $50.50 was not adequate," but HealthEquity "was not prepared to offer a higher price because its due diligence review uncovered several issues with respect to the Company's lower revenue and earnings trajectory for 2019, concerns over the lack of meaningful new sales activity, the lack of meaningful revenue generation from HSAs, and a higher fully diluted share count than anticipated by HealthEquity due to WageWorks' commitment to issue equity awards to employees that had not been issued due to WageWorks' failure to remain current in its SEC periodic reporting obligations."  *Id.* Willkie also "delivered a revised draft of the merger agreement" that eliminated the go-shop

provision and provided for a termination fee of 3.25% of WageWorks' equity value.  *Id.*

74.     On June 16, 2019, Party C's financial advisor "notified Evercore that Party C had selected a financial sponsor to assist in its acquisition of WageWorks in accordance with the conditions of Party C's proposal" to purchase WageWorks for $55.50 per share.  The Proxy does not disclose whether Party C identified the financial sponsor to WageWorks at this time.  The Proxy also does not disclose whether Party C advised WageWorks that the financial sponsor it had selected had agreed to acquire the "related carve-out business."  The Proxy also does not disclose whether Party C advised WageWorks as to whether due diligence was still projected to be done within the six-to-eight week timeframe beginning with May 24, 2019 or if there was a revised projected date of completion.

75.     On June 17, 2019, the WageWorks Board held a special meeting with members of management and representatives of Evercore and Wilson Sonsini.  Proxy, 33.  The Board discussed the proposals from HealthEquity and Party C and concluded that there was a "low likelihood that a revised offer from Party C would still approach $55.50 per share," and there were "inherent uncertainty and risks associated with Party C's proposal."  *Id.*  The Proxy does not disclose why the WageWorks Board, WageWorks management, Evercore, and Wilson Sonsini determined that there was "a low likelihood" that Party C's revised offer would "approach $55.50 per share" other than the "complexity" involved in its financial sponsor also acquiring "a related carve-out business" and the possibility that due diligence would cause Party C to reduce its offer.

76.     On June 18, Harvey and Evercore advised HealthEquity's financial advisors that the revised offer of $51.00 would not be adequate "but that if HealthEquity raised the price to $53.50, that may be high enough" to reconvene the WageWorks Board.  Proxy, 33.  On June 19,

2019, HealthEquity revised its proposal to $52.00 per share, "subject to the successful negotiation of a final merger agreement by June 23, 2019, at which time HealthEquity's offer would expire." *Id.*

77.     On June 20, 2019, the WageWorks Board held a meeting with members of management and representatives of Evercore and Wilson Sonsini regarding the "communications with HealthEquity, the increase in HealthEquity's offer to $52.00 per share, and that the offer was conditioned upon the successful negotiation of the merger agreement by June 23, 2019.  The WageWorks Board, together with members of management and representatives of Evercore, discussed HeatlhEquity's revised offer of $52.00 per share and how it compared to a valuation of the Company based on financial projections generated by WageWorks management, whether $52.00 per share sufficiently captured the intrinsic value of the Company, the expected timing of the completion of Party C's due diligence, the timing of Party C's revised offer, the complexity involved in the proposed transaction with Party C and its financial partner, the low likelihood that a revised offer from Party C would still approach $55.50 per share, and the inherent uncertainty and risks underlying Party C's proposal."  Proxy, 33.  The Board further discussed implications of their fiduciary duties in considering "the interplay between evaluating the probability of competing offers coming to fruition, break-up fees, potential challenges in connection with the sale, and the risks in waiting for Party C to provide a revised offer in light of various timing considerations, such as the 2019 annual meeting of stockholders and potential customer and sales disruption."  *Id.*  Ultimately, the Board decided "it was not advisable to wait for Party C (and its financial partner) to complete due diligence and make a revised proposal," and instead "accept the revised offer of $52.00 per share" from HealthEquity.  Proxy, 33-34.  The Proxy does not disclose why the WageWorks Board, WageWorks management, Evercore, and Wilson Sonsini

determined that there was "a low likelihood" that Party C's revised offer would "approach $55.50 per share" other than the "complexity" involved in its financial sponsor also acquiring "a related carve-out business" and the possibility that due diligence would cause Party C to reduce its offer.

78.     Between June 20, 2019 and June 23, 2019, Willkie and Wilson Sonsini negotiated and finalized open issues in the merger agreement.  Proxy, 34.  On June 23, 2019, "the parties discovered there was a misunderstanding between the parties regarding the outstanding fully diluted share count of WageWorks due to WageWorks treatment of outstanding RSUs that had vested but not yet settled." *Id.*  The Proxy does not disclose the original and revised numbers of fully diluted shares as contemplated by HealthEquity or HealthEquity "misunderstood" the number of RSUs that were outstanding and vested but yet settled even though HealthEquity had completed its due diligence.  The Proxy also does not disclose when the disputed RSUs were issued and became vested or whether the disputed RSUs included RSUs held by members of the WageWorks Board, WageWorks' management, WageWorks' line employees, or some other group.

79.     On June 25, 2019, HealthEquity revised its offer to $51.20 per share, "attributing the decrease in the price per share primarily to the additional shares," and delivered a revised draft of the merger agreement, "which, amount other things, contemplated a new closing condition that, subject to certain exceptions, required WageWorks and its auditors, if requested by HealthEquity, to deliver customary auditor consents and comfort letters and confirm in writing at the time of a debt or equity financing that they were prepared to deliver comfort letters with respect to such financing."  Proxy, 34.  On June 26, WageWorks management confirmed that an adjustment to the per-share price "was acceptable based on the fully diluted share count being higher than originally contemplated by HealthEquity, but that a proportionate adjustment did not

equate to a decrease to $51.20 per share.  After negotiation, the parties agreed to a revised price of $51.35 per share," and subsequently "negotiated and finalized the remaining open issues in the merger agreement."  The Proxy does not disclose how WageWorks determined the $51.35 per share amount was proportionate.  The Proxy also does not disclose how the WageWorks management reacted to the "new closing condition" regarding auditor consents and comfort letters.  The Proxy also does not disclose whether management discussed the possibility of resuming negotiations with Party C at this time.

80.     On June 26, 2019, the WageWorks board held a special meeting with members of management, Evercore, and Wilson Sonsini to consider the revised proposal, and "after discussing potential reasons for and against the proposed transaction (see below under the caption "The Merger—Reasons for the Merger; Recommendation of the WageWorks Board of Directors"), the WageWorks Board unanimously" resolved to recommend completion of the Proposed Transaction to shareholders.  Proxy, 34-35.  That evening, the parties executed the Merger Agreement.  Proxy, 35.

81.     On the morning of June 27, 2019, WageWorks and HealthEquity issued a joint press release, which stated, in part:

> HealthEquity to Acquire WageWorks Accelerating Market-Wide Transition to HSAs
> Delivers sustained growth, significant synergies, rapid deleveraging
>
> DRAPER, Utah and SAN MATEO, Calif., June 27, 2019 (GLOBE NEWSWIRE) -- HealthEquity, Inc. (NASDAQ: HQY) ("HealthEquity"), the nation's largest independent health savings account ("HSA") non-bank custodian, and WageWorks, Inc., (NYSE: WAGE) ("WageWorks"), a leader in administering HSAs and complementary consumer-directed benefits ("CDBs"), today announced that they have entered into a definitive agreement under which HealthEquity will acquire all of the issued and outstanding shares of common stock of WageWorks for $51.35 per share in cash, representing a total enterprise value of approximately $2 billion. The all-cash offer represents a 28% premium to the volume weighted average

closing price of WageWorks shares for the 30 trading days prior to HealthEquity's acquisition proposal becoming public on April 29, 2019.

The acquisition is expected to give HealthEquity access to more of the fast-growing HSA market by expanding its direct distribution to employers and benefits advisors as a single source, premier provider of HSAs and complementary CDBs, including flexible spending accounts, health reimbursement arrangements, COBRA administration and commuter accounts. Its focus on member engagement and remarkable service enables HealthEquity to more fully meet the needs of employers, partners and a broader range of consumers along the continuum of health savings.

Jon Kessler, President and CEO of HealthEquity, commented on the acquisition, "Acquiring WageWorks positions us to accelerate the market-wide transition to HSAs, with greater market access and an end-to-end proprietary platform built to drive members to spend smarter while saving for healthcare in retirement. Together, we can meet employers and employees wherever they are on their journeys to connect health and wealth, while simultaneously accelerating our growth in an expanding industry. This transaction is compelling for team members and stockholders of both companies and it accelerates the strategic goals of both companies immediately by adding WageWorks' market-leading CDB services to HealthEquity's highly acclaimed HSA platform."

Edgar Montes, President and CEO of WageWorks, noted: "The combination of WageWorks and HealthEquity will be transformative in our industry and will amplify our impact among clients, brokers and policymakers. Together with HealthEquity, WageWorks can bring broader, deeper, more innovative solutions to our customers – giving them greater choice and peace of mind. This transaction recognizes and reflects our strong brand and reputation in the market."

Stuart C. Harvey, Jr., Executive Chairman of WageWorks, said: "This transaction underscores everything we've accomplished as we have worked to rebuild WageWorks and emerge stronger than ever.  Our Board of Directors, in line with its fiduciary duties, worked with financial and legal advisors to carefully review the HealthEquity proposal in the context of our business and the industry as a whole, and following that review we are pleased to deliver to WageWorks stockholders the premium value inherent in this transaction."

**Financial Details**

HealthEquity has identified significant synergy opportunities and anticipates approximately $50 million in annualized, on-going synergies that will be realized within 24 to 36 months of closing, primarily through custodial and interchange revenue and operating efficiencies. HealthEquity also anticipates generating significant incremental revenue synergies over time as the combined client base takes advantage of the complete offering.

HealthEquity has received from Wells Fargo Bank a debt commitment to finance the acquisition. HealthEquity expects to deleverage rapidly through strong, predictable future cash flow and growth.

The transaction has been approved by the boards of directors of both HealthEquity and WageWorks and is subject to WageWorks' stockholder approval, regulatory approvals and other customary closing conditions, but is not subject to the availability of financing. It is expected to close before year-end. HealthEquity expects to provide guidance on the future financial impact of the transaction on or before the closing of the transaction.

Following the close of the transaction, Jon Kessler will serve as President and CEO of the combined company. Kessler continued, "We look forward to welcoming the talented WageWorks team into HealthEquity's "purple" culture of remarkable service to our customers and to each other. This transaction will open new opportunities for both team members and partners. We are committed to ensuring a smooth transition for all of our stakeholders as we expand the benefits we can offer."

82.     Rather than continuing to build upon WageWorks' improving prospects, the Offer

Consideration being offered to WageWorks' public shareholders in the Proposed Transaction is

unfair and grossly inadequate because, among other things, the intrinsic value of WageWorks

common stock is materially in excess of the amount offered given the Company's recent financial

performance and its prospects for future growth and earnings.

83.     Indeed, Party C had indicated that it was interested in acquiring WageWorks for

$55.50 per share but WageWorks' Board and management inexplicably turned a cold shoulder to

Party C in favor of HealthEquity's inferior offer of $52.00 per share out of concern that Party C's

due diligence, which was projected to be completed within three weeks or so, would have caused

Party C to decrease its offer. In fact, following receipt of Party C's initial indication of interest to

purchase WageWorks for $55.50 per share, WageWorks continued to show strong financial

prospects, including by shoring up its continued viability on the NYSE by correcting its SEC

filings. Indeed, notwithstanding WageWorks' concern that Party C would revise the proposed

consideration downward from its proposal of $55.50 per share, it was actually HealthEquity that

revised the merger consideration downward from its $52.00 per share proposal that WageWorks terminated negotiations with Party C to accept.  In light of the plainly superior consideration that Party C had offered, WageWorks effectively sold out its public shareholders in abandoning the go-shop provisions in favor of HealthEquity's proposal.

**The Preclusive Deal Protection Devices**

84.     To the detriment of WageWorks shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

85.     Section 7.4 of the Merger Agreement is a restrictive "no-shop" provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

86.     Section 7.4(a) and (b) of the Merger Agreement also strictly prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

87.     Section 7.4(e) of the Merger Agreement requires the Board to provide HealthEquity with written notice of any alternative Acquisition Proposal within twenty-four (24) hours of its receipt.  As Section 7.4(d) requires the Board to provide prior written notice of at least three (3) business days of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with HealthEquity following HealthEquity's receipt of the notice, so that HealthEquity has the opportunity to adjust the terms and conditions of the Merger Agreement so that the alternative Acquisition Proposal ceases to be a Superior Proposal.

88.     In addition, the Merger Agreement provides that the Company will be required to pay to Parent a termination fee of $69,656,872 to HealthEquity with respect to any termination under the No-Shop provisions of the Merger Agreement.

89.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for WageWorks shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

90.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

91.     On July 19, 2019, Defendants filed a materially incomplete and misleading Preliminary Proxy Statement with the SEC.  The special meeting of WageWorks stockholders to vote on the Proposed Transaction is forthcoming.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting decision in connection with the Proposed Transaction.  Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction and the Individual Defendants' potential conflicts of interest; and (ii) information regarding the assumptions and inputs that render

30

Evercore's fairness analysis materially false, misleading, or incomplete.

**A.  The Proxy Omits Material Information Regarding the Background of the Proposed Transaction and the Individual Defendants' Potential Conflicts of Interest**

92.      The Proxy fails to provide material information regarding the background of the merger that implicate potential conflicts of interest for WageWorks' directors.

93.      The Proxy discloses that, on December 3, 2018, a representative of "a financial sponsor" contacted Harvey "to discuss such financial sponsor's potential interest in exploring discussions regarding a strategic transaction with WageWorks," and followed this contact up with a December 7, 2018 letter to Harvey "confirming its interest to partner with another financial sponsor in acquiring WageWorks,"  but ultimately did not engage in "further substantive discussions," and "did not execute a confidentiality agreement with WageWorks." *Id.*  The Proxy fails to disclose the identity or nature of the business of this financial sponsor, the other financial sponsor that would have "partnered" with it, or why it did not engage in further substantive discussions with WageWorks.  *Id.*  This information is material to stockholders in deciding whether to vote for the Proposed Transaction because the reason that a potential counterparty terminated discussions regarding a business combination with WageWorks could reflect the possibility that the counterparty thought WageWorks overvalued and weigh into investors' opinion of whether the Proposed Transaction adequately compensates investors for the intrinsic value of their stock.

94.      The Proxy discloses that Evercore advised the WageWorks Board regarding "actions undertaken by stockholders" at its December 3, 2018 but fails to disclose the identity and nature of the stockholder actions that Evercore was advising WageWorks regarding.  This information is material to shareholders because WageWorks' Board, management, and financial advisors expressly considered these actions in discussing WageWorks' intrinsic value.

31

95.     The Proxy discloses that a representative of a financial sponsor met with Harvey on December 12, 2018 and followed up on December 31, 2018 with a letter to WageWorks management indicating its general interest in "acquiring 100% of the outstanding shares of WageWorks for a cash consideration of at least $35 per share," but does not the identity or nature of the business of this "financial sponsor" and does not disclose why it did not engage in further substantive discussions.

96.     On January 8, 2019, Harvey held a meeting with a representative of another financial sponsor regarding a strategic transaction.  Proxy, 25.  Although this financial sponsor followed up the next day to confirm its interest in an email, "[u]ltimately, this financial sponsor did not engage in further substantive discussions," and did not execute a confidentiality agreement.  *Id.*  Although this financial sponsor did not execute a confidentiality agreement, the Proxy does not disclose the identity or nature of the business of this "financial sponsor" and does not disclose why it did not engage in further substantive discussions.  This information is material to stockholders in deciding whether to vote for the Proposed Transaction because the reason that a potential counterparty terminated discussions regarding a business combination with WageWorks could reflect the possibility that the counterparty thought WageWorks overvalued and weigh into investors' opinion of whether the Proposed Transaction adequately compensates investors for the intrinsic value of their stock.

97.     The Proxy discloses that the WageWorks Board advised Evercore that it believed third parties were looking to take advantage of WageWorks' depressed trading price at its meeting on January 11, 2019, but the Proxy fails to disclose what the Board estimated WageWorks' intrinsic value to be at the time of the January 11, 2019 Meeting.  This information is material to shareholders in deciding whether to vote for the Proposed Transaction because shareholders

would consider WageWorks' own valuation of its stock in determining whether the Merger Consideration fairly compensates them for the value of their stock.

98.     The Proxy discloses that the Board and representatives of Evercore "also discussed the likelihood that BDO and MGO would complete their respective audits" such that WageWorks could "become current in its SEC filings by March 19, 2019" at the January 11, 2019 Board meeting, but does not disclose the substance of these discussions and whether the Board and/or Evercore found it likely that BDO and MGO would complete these audits and WageWorks would become current.  This information is material to stockholders in deciding whether to vote for the Proposed Transaction because the WageWorks Board and Evercore expressly discussed the impact of these audits and SEC filings on the continued viability of WageWorks stock trading on the NYSE and the intrinsic value of WageWorks stock.

99.     The Proxy discloses that Evercore led the WageWorks Board through an "initial valuation framework" at the January 29, 2019 Board meeting, but does not disclose whether Evercore and the Board reached an actual estimated value in its "initial valuation framework," and if so what the estimated value was.  This information is material to shareholders deciding whether to vote for the Proposed Transaction because shareholders would consider WageWorks' own valuation of its stock in determining whether the Merger Consideration fairly compensates them for the value of their stock.

100.     The Proxy discloses that Harvey, members of management, and certain members of the WageWorks Board "held a dinner meeting with representatives from Sponsor C" on February 13, 2019 but that Sponsor C did not ultimately engage in further substantive discussions with management and did not execute a confidentiality agreement with WageWorks.  The Proxy does not disclose which "certain members of the WageWorks Board" were present for this dinner

meeting, and although Sponsor C did not execute a confidentiality agreement, the Proxy does not disclose the identity or nature of the business of this "financial sponsor" and does not disclose why it did not engage in further substantive discussions.  This information is material to stockholders deciding whether to vote for the Proposed Transaction because it provided an opportunity to steer Sponsor C away from considering WageWorks as a potential counterparty, and because the reason that a potential counterparty terminated discussions regarding a business combination with WageWorks could reflect the possibility that the counterparty thought WageWorks overvalued and weigh into investors' opinion of whether the Proposed Transaction adequately compensates investors for the intrinsic value of their stock.

101.    The Proxy discloses that Montes had a telephone call with a representative of Party B on April 1, 2019 to discuss "the possible expansion of the parties' commercial relationship" but does not disclose the scope or extent of the parties' prior existing commercial relationship, if any, or the extent to which relationship might be expanded pursuant to this discussion.  This information is material to stockholders considering whether to vote for the Proposed Transaction because such an expansion could create synergies that would benefit WageWorks' investors.

102.    The Proxy discloses that representatives of a financial sponsor, Sponsor E, met with a representative of WageWorks on April 8, 2019, but  does not disclose the identity of the "representative" of WageWorks who met with the representatives of Sponsor E and does not state whether he or she was a representative from WageWorks' management or Board.  This information is material to stockholders deciding whether to vote for the Proposed Transaction because it provided an opportunity to steer Sponsor E away from considering WageWorks as a potential counterparty and would weigh into investors' opinion of whether the Proposed Transaction adequately compensates investors for the intrinsic value of their stock.

103.    The Proxy discloses that the WageWorks Board held a regularly scheduled meeting on April 25, 2019 and discussed potential strategies including contacting other parties to assess their interest in a potential acquisition and entering into a confidentiality and standstill agreement with HealthEquity to enable HealthEquity to better understand WageWorks' business and operations and thereby allow HealthEquity to potentially increase its proposed purchase price above the $50.50 per share price set forth in the April 11 Offer, but does not disclose the substance of the Board's discussion of each of these alternatives, or whether its ultimate determination as to how to proceed was unanimous.  This information is material to stockholders considering whether to vote for the Proposed Transaction because shareholders would consider WageWorks' own valuation of its stock in determining whether the Merger Consideration fairly compensates them for the value of their stock.

104.    The Proxy discloses that Kessler advised Harvey by text message that HealthEquity "had received questions from the press regarding the April 11 Offer" on April 29, 2019, that following this text message and "press reports speculating over a potential offer from HealthEquity," WageWorks issued a press release confirming the "unsolicited, non-binding proposal," and that HealthEquity issued a Press Release the following day, "confirming that it had made a non-binding proposal to acquire WageWorks for $50.50 per share in cash."  The Proxy fails to disclose whether the "press reports speculating over a potential offer from HealthEquity" were based on information that was leaked by persons at or acting on behalf of WageWorks or by persons at or acting on behalf of HealthEquity.  This information is material to stockholders considering whether to vote in favor of the Proposed Transaction because this information may have been deliberately leaked in order to effectuate merger immediately rather than through a more deliberate process by which WageWorks could have considered all offers,

35

including offers superior to HealthEquity's, such as Sponsor C's proposal.

105.     The Proxy discloses that ten parties, including HealthEquity, executed confidentiality agreements with WageWorks, with nine of such agreements, including that of HealthEquity, containing standstill provisions that would terminate upon WageWorks having entered into a definitive agreement to effectuate a business combination, and certain of which standstill provisions, including that of HealthEquity, would terminate upon a third party announcing a tender offer to acquire more than 50% of WageWorks' outstanding shares of common stock, but fails to disclose how many and which of the nine standstill agreements terminated upon a third party's tender offer.   This information is material to stockholders considering whether to vote in favor of the Proposed Transaction because the failure to terminate a standstill agreement reduces public shareholders' ability to exchange their stock pursuant to takeover offers.   As Party C ultimately made a proposal that would have compensated WageWorks stockholders with cash consideration substantially superior to the Merger Consideration, whether Party C's standstill agreement terminated with the announcement of the Proposed Transaction is crucial to WageWorks' public stockholders in considering how to vote.

106.     The Proxy discloses that, between April 30, 2019 and May 6, 2019 WageWorks management and Evercore engaged in discussions with several potential counterparties regarding a potential strategic transaction with WageWorks, but fails to disclose whether any of these potential counterparties communicated a proposal, or whether any of these potential counterparties otherwise expressed an interest in "beating" the $50.50 per share offer that WageWorks and HealthEquity had recently publicly confirmed in their respective press releases. This information is material to stockholders considering whether to vote for the Proposed Transaction because it pertains directly to the possibility of whether WageWorks knew of

potential counterparties that intended to offer WageWorks' public stockholders superior consideration relative to HealthEquity's proposals.

107.    The Proxy discloses that the WageWorks Board held a special meeting regarding communications with HealthEquity, other potentially interested parties, and certain significant customers and stockholders, the inadequacy of the $50.50 offer on May 5, 2019, and authorized Evercore to request initial indications from the parties involved in the strategic process by May 24, 2019, but the Proxy fails to disclose whether the Board specifically discussed any "other potentially interested parties" and, if so, which, and also does not provide any details as to these "significant customers and stockholders" or why they were discussed at this special meeting. This information is material to stockholders considering whether to vote in favor of the Proposed Transaction because the meeting was an opportunity for WageWorks to steer negotiations towards HealthEquity and away from other potential counterparties, and the substance of these discussions pertains directly to whether such steering was taking place.

108.    The Proxy discloses that WageWorks directed members of management and representatives of Evercore again to convey to HealthEquity that the WageWorks board believed that HealthEquity's offer of $50.50 per share did not adequately value the Company on May 14, 2019 but fails to disclose how much consideration per-share the WageWorks Board instructed Wilson Sonsini to provide for in its "revised draft of the merger agreement. This information is material to stockholders considering whether to vote for the Proposed Transaction because shareholders would consider WageWorks' own valuation of its stock in determining whether the Merger Consideration fairly compensates them for the value of their stock.

109.    The Proxy discloses that the draft merger agreement that Wilson Sonsini delivered on May 17, 2019 contemplated, among other things, a 60 day 'go-shop' period with an ability to

continue with a party that has submitted a written proposal that is reasonably likely to lead to a superior proposal, and a termination fee of 3% of the equity value of WageWorks in the event WageWorks entered into an alternative proposal, or 1% of the equity value of WageWorks in the event WageWorks entered into an alternative proposal with an 'excluded party.  The Proxy fails to disclose how much consideration per-share the WageWorks Board instructed Wilson Sonsini to provide for in its revised draft of the merger agreement, and also does not disclose whether there were parties that would have been considered "Excluded Parties" subject to the "go-shop" provision at the time Wilson Sonsini delivered the May 17, 2019 draft merger agreement, and if so, the identity of those parties and the material terms of their outstanding alternative written proposals.  This information is material to stockholders considering whether to vote for the Proposed Transaction because shareholders would consider WageWorks' own valuation of its stock in determining whether the Merger Consideration fairly compensates them for the value of their stock, and further weighs on stockholders' analysis of WageWorks' purpose in proposing the go-shop provision.

110.    The Proxy discloses that Party C's financial advisor notified Evercore that Party C had selected a financial sponsor to assist in its acquisition of WageWorks in accordance with the conditions of Party C's proposal to purchase WageWorks for $55.50 per share on June 16, 2019 but the Proxy fails to disclose whether Party C identified the financial sponsor to WageWorks at this time, whether Party C advised WageWorks that the financial sponsor it had selected had agreed to acquire the "related carve-out business," and whether Party C advised WageWorks as to whether due diligence was still projected to be done within the six-to-eight week timeframe beginning with May 24, 2019 or if there was a revised projected date of completion.  This information is material to stockholders considering whether to vote in favor of

the Proposed Transaction because it pertains directly to the likelihood that Party C's proposal to acquire WageWorks for $55.50 per share would lead to a Superior Offer and the timeframe during which Party C would make its revised offer.

111.     The Proxy discloses that the WageWorks Board discussed the proposals from HealthEquity and Party C on June 17, 2019, and concluded that there was a low likelihood that a revised offer from Party C would still approach $55.50 per share, and there were inherent uncertainty and risks associated with Party C's proposal, but fails to disclose why the WageWorks Board, WageWorks management, Evercore, and Wilson Sonsini determined that there was "a low likelihood" that Party C's revised offer would "approach $55.50 per share" other than the "complexity" involved in its financial sponsor also acquiring "a related carve-out business" and the possibility that due diligence would cause Party C to reduce its offer.  This information is material to stockholders considering whether to vote in favor of the Proposed Transaction because it pertains directly to the likelihood that Party C's proposal to acquire WageWorks for $55.50 per share would lead to a Superior Offer and the timeframe during which Party C would make its revised offer.  As WageWorks had submitted its Form 10-K after Party C's initial proposal and HealthEquity's offer increased rather than decreased following HealthEquity conducting its due diligence, it is patently unclear why WageWorks believed Party C's would revise its offer downward.

112.     The Proxy discloses that the WageWorks Board decided "it was not advisable to wait for Party C (and its financial partner) to complete due diligence and make a revised proposal," and instead "accept the revised offer of $52.00 per share" from HealthEquity on June 20, 2019 but fails to disclose why the WageWorks Board, WageWorks management, Evercore, and Wilson Sonsini determined that there was "a low likelihood" that Party C's revised offer

would "approach $55.50 per share" other than the "complexity" involved in its financial sponsor also acquiring "a related carve-out business" and the possibility that due diligence would cause Party C to reduce its offer.  This information is material to stockholders considering whether to vote in favor of the Proposed Transaction because it pertains directly to the likelihood that Party C's proposal to acquire WageWorks for $55.50 per share would lead to a Superior Offer and the timeframe during which Party C would make its revised offer.  As WageWorks had submitted its Form 10-K after Party C's initial proposal and HealthEquity's offer increased rather than decreased following HealthEquity conducting its due diligence, it is patently unclear why WageWorks believed Party C's would revise its offer downward.

113.    The Proxy discloses that the parties discovered there was a misunderstanding between the parties regarding the outstanding fully diluted share count of WageWorks due to WageWorks treatment of outstanding RSUs that had vested but not yet settled on June 23, 2019, but fails to disclose the original and revised numbers of fully diluted shares as contemplated by HealthEquity or HealthEquity "misunderstood" the number of RSUs that were outstanding and vested but yet settled even though HealthEquity had completed its due diligence.  The Proxy also does not disclose when the disputed RSUs were issued and became vested or whether the disputed RSUs included RSUs held by members of the WageWorks Board, WageWorks' management, WageWorks' line employees, or some other group.  This information is material to stockholders considering whether to vote in favor of the Proposed Transaction because it pertains directly to the cash value of the consideration that stockholders were receiving per share, the potentially unexplained decrease in that value after the WageWorks Board accepted HealthEquity's offer in light of the possibility that due diligence would cause Party C to revise its offer to reduce the cash consideration from its $55.50 per share proposal, and the possibility that conflicts of interest may

have led the Individual Defendants to agree to accept inferior consideration.

114.   The Proxy discloses that WageWorks and HealthEquity "negotiated" to a revised price of $51.35 per share, and subsequently negotiated and finalized the remaining open issues in the merger agreement, but fails to disclose how WageWorks determined the $51.35 per share amount was proportionate, how the WageWorks management reacted to the "new closing condition" regarding auditor consents and comfort letters, and whether management discussed the possibility of resuming negotiations with Party C at this time. This information is material to stockholders considering whether to vote in favor of the Proposed Transaction because it pertains directly to the cash value of the consideration that stockholders were receiving per share, the potentially unexplained decrease in that value after the WageWorks Board accepted HealthEquity's offer in light of the possibility that due diligence would cause Party C to revise its offer to reduce the cash consideration from its $55.50 per share proposal, the possibility that conflicts of interest may have led the Individual Defendants to agree to accept inferior consideration, and whether WageWorks seriously considered the possibility that Party C may have been a preferable counterparty to HealthEquity.

115.   The *Treatment of Equity Awards* disclosures beginning on Page 51 of the Proxy disclose that several officers and directors of WageWorks are entitled to substantial golden parachute compensation but the Proxy fails to disclose whether the effective employment agreements (and consequently the severance packages), including the agreements with Montes and Harvey, were the result of amendments that were made in anticipation of the Proposed Transaction. Instead, the Proxy discloses only that these are the terms effective "as of July 1, 2019," after the Board had already agreed to approve the Proposed Transaction. Such conflict of interest information is material to stockholders deciding whether to vote for the Proposed

Transaction, particularly in light of the confusion regarding the number of fully diluted shares and treatment of outstanding RSUs and the resulting decrease in the per-share value of the Merger Consideration.

**B.  The Proxy Omits Material Information Regarding Financial Projections, Inputs, and Assumptions for Various Financial Valuations and WageWorks' Financial Advisors' Potential Conflicts of Interest**

116.    The Proxy describes Evercore's Fairness Opinion and the various valuation analyses that Evercore performed to render its opinion.  However, the Proxy fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness analysis.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations, and Evercore's potential conflicts of interest.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate Evercore's opinion that the consideration offered to the Company's shareholders in the Proposed Transaction is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  These key inputs, which were baked into those conclusions, must also be fairly disclosed.

117.    With respect to Evercore's *Discounted Cash Flow Analysis* beginning on Page 40, the proxy fails to disclose the unlevered free cash flow projections themselves, the most important input in the *Discounted Cash Flow Analysis*.  The Proxy also fails to disclose: (i) how stock-based compensation would have been treated in the analysis (i.e., cash or non-cash expense); (ii) the value of the Company's NOLs accounted for in this analysis, if at all; (iii) a full sensitivity table; (iv) the entire range of discount rates, growth rates, and projected unlevered, after-tax free cash flows; (v) the actual number of fully diluted shares of the Company; and (vi) the rationale

and basis: for (a) applying a selected range of terminal forward multiples and (b) the range of implied perpetuity growth rates derived in the analysis (i.e., 2.0 % to 5.0%). This information is material to stockholders because it pertains directly to the intrinsic value of the Company's common stock. Indeed, unlevered free cash flows are widely recognized as the most important valuation metric when it comes to valuing a company, and disclosing the EBITDA or Levered Free Cash Flow projections is not sufficient because the value of companies should be premised upon the company's projected future unlevered free cash flows.

118.    With respect to Evercore's *Selected Transactions Analysis* beginning on Page 41, the Proxy fails to disclose Evercore's basis for deeming the companies analyzed as "target" companies, other than a vague statement that Evercore, "in its professional judgment and experience," considered them "generally relevant to WageWorks for purposes of its financial analyses" based on "general business, economic and market conditions and other factors existing," as well as "differences in financial, business and operating characteristics and other factors relevant to the target companies or businesses in the selected transactions." The Proxy also fails to disclose the basis for Evercore's selected range of multiples for the selected companies and why Evercore selected these ranges. The Proxy Statement also fails to disclose the individual Revenue and EBITDA multiples for each transaction. The Proxy Statement also fails to disclose the P/E multiples of the selected companies. This information is important for shareholders considering the *Selected Transactions Analysis* because its conclusions turn on the target transactions, and without knowing all of the independent criteria used in determining whether a company was "generally relevant," it is impossible to determine whether any outliers were erroneously included or otherwise relevant transactions were erroneously excluded. Indeed, the conclusions of the *Selected Transactions Analysis* are particularly vulnerable to the inclusion

of outlier transactions or failure to include relevant transactions because only seven transactions were selected, and the data are summarized only by Range and Mean, which implicates the possibility that outlier transactions may greatly skew the results.

119.    With respect to Evercore's *Selected Public Company Trading Analysis* beginning on Page 42, the Proxy fails to disclose Evercore's basis for selecting the companies that Evercore included, other than a vague statement that Evercore, "in its professional judgment and experience," considered them "generally relevant to WageWorks for purposes of its financial analyses" based on "general business, economic and market conditions and other factors existing," as well as "differences in financial, business and operating characteristics and other factors relevant to the target companies or businesses in the selected transactions."  The Proxy also fails to disclose the basis for Evercore's selected range of multiples for the selected companies and why Evercore selected these ranges.  The Proxy Statement also fails to disclose the individual multiples for the selected companies, and instead breaks them down by industry. This information is important for shareholders considering the *Selected Public Company Trading Analysis* because its conclusions turn on multiples of the companies that were selected, and without knowing all of the independent criteria used in determining whether a company was "generally relevant," it is impossible to determine whether any outliers were erroneously included or otherwise relevant companies were erroneously excluded.  Further, the conclusions of the *Selected Transactions Analysis* are particularly sensitive to the inclusion of outlier companies or failure to include relevant transactions because only a few were selected for each industry, and the data are summarized only by Range and Mean, which implicates the possibility that outliers may greatly skew the results.

120.    With respect to Evercore's *Equity Research Analyst Price Targets* analysis, the

Proxy states that "Evercore reviewed selected public market trading price targets for the shares of WageWorks common stock prepared and published by equity research analysts that were publicly available as of April 29, 2019, the last full trading day prior to media reports of the possibility of a merger, and as of June 26, 2019, the last full trading day prior to the delivery by Evercore of its opinion to the board," and that the "range of selected equity research analyst price targets per share of WageWorks common stock was $43.00 to $50.00 as of April 29, 2019 and $50.00 to $60.00 as of June 25, 2019." The Proxy fails to disclose the actual price targets observed and fails to summarize the price targets in a meaningful way, and does not provide any measurement of central tendency. Without the individual price targets themselves, a quartile, quintile, or decile summary, or at a minimum some measurement of variance, it is impossible to tell whether the range fairly summarizes the data observed. This omitted information is material to a shareholder deciding whether to tender stock because it goes directly to how much weight the investor should place on the *Equity Research Analyst Price Targets* analysis.

121.    The Proxy also fails to provide all of the financial projections provided by WageWorks' management and relied upon by Evercore for purposes of the fairness analyses, for fiscal years 2019-2024, for the following items: (i) whether projected Depreciation and Amortization (calculated as the difference between Adjusted EBITDA and NOPAT) was adjusted to exclude the impact of amortization expenses related to intangible assets acquired through acquisitions and business combinations, (ii) Taxes (or tax rate), (iii) Stock-based compensation expense, (iv) Changes in net working capital, (v) Capital expenditures, (vi) Any other line items used in the calculation of unlevered free cash flow, and (vii) Unlevered free cash flow. With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the

banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

122.    The Proxy also fails to fully disclose all potential conflicts-of-interest for Evercore.  This conflict of interest information is material to shareholders because it directly informs shareholders as to how much weight they should give to Evercore's Fairness Opinion. Page 46 of the Proxy discloses that an "a potential discretionary fee of $1.5 million" may be paid to Evercore but fails to disclose the factors that WageWorks will consider in employing its discretion.

123.    Further, Page 46 of the Proxy also discloses that Evercore and its affiliates "have provided financial advisory services to WageWorks and received fees for the rendering of these services in the amount of less than $1.0 million" but does not say the actual amount that Evercore received.  Page 46 of the Proxy further discloses that Evercore "may provide financial advisory or other services to WageWorks and HealthEquity in the future" but fails to disclose whether any services are, in fact, mutually understood to be contemplated between Evercore and WageWorks and/or HealthEquity.

124.    If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).  Accordingly, Defendants have disclosed some of the information related to the projections relied upon by Evercore, but have omitted crucial line items

and reconciliations.  Thus, Defendants' omission renders the projections disclosed in the Proxy misleading.

125.    Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

126.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming stockholder vote concerning the Proposed Transaction, Plaintiff and WageWorks' other public shareholders will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I
### (Against All Defendants for Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9)

127.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

128.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

129.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that Proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

130.    The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

131.    Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) complete and accurate financial projections for WageWorks; (ii) complete and accurate valuation analyses performed by Evercore in support of its fairness opinion; and (iii) potential conflicts of interest on the part of the Individual Defendants and Evercore with respect to the Proposed Transaction.

132.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

133.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.

The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Evercore reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Evercore, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Evercore's analyses in connection with their receipt of the fairness opinions, question Evercore as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

134.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a Proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

135.    The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

136.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Stockholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

137.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

138.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

139.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

140.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.    The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.    They were thus directly involved in preparing this document.

141.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.    The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.    The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

142.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

143.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.    By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.    As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

144.    Plaintiff has no adequate remedy at law.    Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.       Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Stockholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.       Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.       Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.       Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 30, 2019

                                                      **MONTEVERDE & ASSOCIATES PC**

                                                      _/s/ Juan E. Monteverde_
                                                      Juan E. Monteverde (JM-8169)
**OF COUNSEL:**                                       The Empire State Building
                                                      350 Fifth Avenue, Suite 4405
**ADEMI & O'REILLY, LLP**                             New York, NY 10118
Guri Ademi                                            Tel:(212) 971-1341
Jesse Fruchter                                        Fax:(212) 202-7880
3620 East Layton Avenue                               Email: jmonteverde@monteverdelaw.com
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001                                   _Attorneys for Plaintiff_
Email: gademi@ademilaw.com
        jfruchter@ademilaw.com

_Attorneys for Plaintiff_